FAY and WILSON *vs.* GRIMSTEED.

Since the adoption of the code of procedure, there is no longer any such plea as the general issue; and there can not be an answer in that form.

It is one of the principal objects of the code, to abrogate the old forms of pleading, and to bring the parties to a plain, concise, and direct statement of the facts which constitute the cause of action, or the defense, in place of the general statement formerly in use.

The form of allegation, and counter allegation, was adopted with a view to compel the adverse parties to disclose to each other, the facts upon which they respectively rely, to uphold the claim upon the one side, and to maintain the defense on the other; so that each may know what he will be required to establish or repel, by the proofs upon the trial. In this respect, the pleadings are similar to those which obtained in the courts of equity.

The defense of usury, therefore, if the defendant means to rely upon it, must be distinctly set out in his answer; and the terms of the usurious contract, and the quantity of interest or premium taken, or agreed to be given, must be distinctly and correctly stated. Usury can no longer be given in evidence under a general denial of the promise to pay.

Under the code, a variance between the pleadings and the proof, sufficient to defeat the action, or destroy the defense, must leave the case *unproved* in its *entire scope and meaning.* If left *unproved* in some particular or particulars, it is a subject for amendment upon terms, if the adverse party has been misled by it; otherwise, amendments may be made at the trial, and without any conditions whatever.

Upon a jury trial at the circuit, the plaintiffs proved the execution of the promissory notes upon which the suit was brought; the defense of usury was set up, but no evidence was given in support of it. The judge's charge contained a simple and correct exposition of the law of usury, as applicable to the case under consideration; but he then proceeded further, and told the jury, " it was for them to determine from the evidence, whether such unlawful interest was contracted for, and if they found that it was, their verdict should be for the defendant; if not, for the plaintiff." *Held*, that the judge erred, because his language implied that there was some evidence from which the jury might legally infer that the usurious agreement was established; when, from the testimony given on the trial, the jury should have been told, that there was no evidence to sustain the defense of usury, and that the plaintiffs were entitled to their verdict.

THIS was an appeal by Fay and Wilson to the general term of the court, from a judgment entered upon the direction of a

VOL. X.		41

single judge, upon a verdict rendered for the defendant. The appellants, who were plaintiffs in the suit, in their complaint, set forth a check drawn by the respondent, on the Long Island Bank, dated 4th of November, 1848, for $200; and his promissory note, dated 23d of December, 1848, payable to the order of the plaintiffs, four days after date, for $135; and demanded judgment for the amount thereof, with interest. The answer of the respondent, who was the defendant in the suit, denied any indebtedness to the plaintiffs; but stated that the defendant, in August, 1848, applied to the appellant Fay, a broker in Wall-street, for a loan of money; that Fay proposed to loan the money to the defendant for seven days, at the rate of fifty cents a day for each hundred dollars, and to take the defendant's check on the Long Island Bank for $315, dated seven days in advance; that the defendant being in great distress for money, did borrow from Fay upon those terms, and gave his check upon the Long Island Bank, dated seven days ahead, for the sum of $315, although the defendant received but $304,50; the $10,50 being the interest for seven days, as was agreed upon. That he, the defendant, continued to pay said interest, and to renew the check weekly; paying, at each renewal, the interest at the rate above stated, for the period of one month from the date of the first payment; and then Fay demanded that $100 should be paid by the defendant, and that he should give a new check for $200; and that the said interest of fifty cents a day for each $100, should be paid in advance; or else Fay would present the check, and force the collection of the whole. That the defendant then borrowed $100 of a friend, and paid it to Fay, and gave him his (defendant's) check for $200, dated one week in advance, at the same time paying the same rate of interest as above stated. This check was drawn upon the Long Island Bank, and at the particular request of Fay, was drawn to the order of a third person, James Bennett, who indorsed the same. This check was also renewed weekly, and dated ahead, and the same rate of interest paid as above stated. The last check was drawn one week *before* the 4th of November, 1848, although dated on that day, when Fay demanded

Fay *v.* Grimsteed

that it should be paid, and refused to renew it longer. That this was the check upon which the action was brought, and this its true history. And that upon this check the defendant paid to the plaintiff, Fay, $50, on the 2d of December, 1848. The answer further stated, that the promissory note mentioned in the complaint, was made as follows : The defendant, in order to pay these enormous rates of interest, and the $100, on the check as above mentioned, was compelled to borrow money of his friends ; and in order to repay them, he resorted to Fay, for more money. Fay offered to loan on the defendant's note, with security, $135 more, at the same rate of interest, fifty cents per day for each $100 ; and the defendant gave his note for $135, due in one week ; and as collateral security, deposited with said Fay three gold watches, worth in cash, at least $225 ; for which note the defendant did not receive the full face, but from the amount received there was deducted the interest of half a cent on each dollar per day, and this note was weekly renewed, and the said usurious interest paid by the defendant to Fay, until 23d of December, 1848, when Fay refused to renew again ; and that such is the note upon which the action was brought, and such its true history. The answer further stated, that these said arrangements were all made with Fay, one of the plaintiffs, who always required that the papers should be made out to the plaintiffs, said Wilson being his partner ; and that for every dollar of the money received upon said note and check, there was an agreement to pay at the time of making the loan, interest at the rate of a half cent per day for every dollar thereof, and that the same was paid until the defendant was no longer able to raise money ; and that the defendant had, by the payment mentioned, and by the usurious rates of interest which he had paid to the plaintiffs, already paid them more than every dollar of principal which he borrowed from them. The answer further stated, that the defendant had requested Fay to return said watches, and offered him $70 in cash, rather than have any difficulty about the matter, if he would give up the watches, which Fay declined to do, and still retained the watches. The answer was sworn to by the defendant. The reply of the plain-

Fay *v.* Grimsteed.

tiffs denied specifically, every allegation contained in the answer of the defendant; and asserted "that there was never taken or reserved, or agreed to be taken or reserved by the said plaintiffs, or either of them, any greater sum for the loan or forbearance of any money or thing in action to the defendant than at, and after the rate of $7 for the loan and forbearance of $100 for one year." ₀ This reply, as well as the complaint, was sworn to by Temple Fay, one of the plaintiffs, but not by Wilson, the other plaintiff.

The cause was tried at the circuit in Kings county, in February, 1850, before Justice Morse, and a jury. The counsel for the plaintiff stated the substance of the issue to the jury; proved the execution of the check and promissory note mentioned in the complaint, and the amount due thereon, and rested. The defendant's counsel then stated to the jury in detail, the facts contained in the answer, and called as a witness, Wait W. Wilson, one of the plaintiffs, who testified that he was a money broker; place of business 74½ Wall-street, in the basement; is one of the plaintiffs; they are, and have been partners, since 1843 or 1844. To the question, "have you done a large business?" (objected to by the plaintiffs' counsel; admitted by the court, and the decision excepted to;) witness answered, "I have been satisfied with the business; some have done more business than we have, and some less. Plaintiffs are equal partners; keep books; both make entries on the books, as the business is done through the day; entries are all made as cash, on a blotter which is the only book kept; had not the books in court relating to business with the defendant; was subpœnaed to bring them; had examined the books, but had seen no entries therein relating to the defendant, or James Bennett. Witness can not say that he was present when the money was loaned to the defendant, on the check or the note. Can find no entry or memorandum on the subject, nor entries on the books, relating to these transactions. Can not tell whether defendant paid any thing on the check or note. Can not find any entry of any payment." The witness was then shown a check drawn by James Bennett on the Atlantic Bank, dated October 1st, 1848, for $100; and

Fay *v.* Grimsteed.

he stated that the amount of that check was received by the plaintiffs ; thought that he, the witness, paid it to Belknap ; did not know who delivered it to witness, nor how it came into the office. Upon being shown the promissory note in suit, the witness said : " The body of that note is in Mr. Fay's hand-writing. I can not tell who received the note. I think I had no business with the defendant, except selling him uncurrent money, and therefore don't know what was given for it. I can find no entry about it. Mr. Fay did the business with Mr. Grimsteed." A note made by the defendant, 21st of November, 1848, payable four days after date, to the order of the plaintiffs, for $135, was then shown to the witness, and he said : " The body of that note is in Mr. Fay's hand-writing. I do not know what was given for that note. I can find no entry about it." Upon being asked, " was there a separation by a screen, between the place where you transacted business in the office, and the place where Mr. Fay did ?" The witness answered, " there was a green curtain around Mr. Fay's desk." He also said, " I have seen the defendant frequently at Mr. Fay's desk when the curtain was drawn. I can not say whether I was present when the check in suit was renewed. I do not know whether it was a renewal or not. There was not a payment of $50 made on the check in suit, on Saturday, December 2d, 1848, to my knowledge ; but I do not know whether there was or not." To the question, " was the defendant punctual in his payments, or did he get the checks and notes renewed ?" the witness answered : " I think he was not punctual ; I presume he had renewals. I can not state whether any security was given with the note in suit, or not. I know that Mr. Fay sold the defendant two gold watches, and I have seen them in the office since. I do not know whether they have been sold or not. Mr. Fay has taken them away. I was in the office when the defendant came in with another man, and demanded the watches. I did not hear what he said." The counsel for the defendant also called, as witness, the plaintiff, Temple Fay, who testified : That he was a money broker ; had followed the business for 22 years ; that he knew the defendant and James Bennett, and had had

business with both; that he thought he loaned the defendant money in August, 1848, and took his note ; did not know what became of that note; defendant took it up; did not recollect whether he received a check of the defendant, indorsed by Bennett for $315; plaintiffs' books would not show; did receive a check of the defendant for $300, indorsed by Bennett, and went to Bennett about it; that was not paid when due; this was not the first one, it was not a renewal; Bennett indorsed a waiver of protest at witness' suggestion; that some time after Bennett came to witness' office, and said the defendant was out of town, and left $100 to be indorsed on the check; it was indorsed on that, or some other check; Bennett took up the $300 check, and left a $200 check; the check in suit grew out of the $300 check. All the checks up to the one on which Bennett waived notice, and on which $100 were paid, were taken up ; did not recollect how long they ran, nor whether they were dated seven days ahead; none of them were renewed; could not tell how many there were of them; he loaned the defendant the money at seven per cent, never at any higher rate.   He thought he gave James Bennett the money for his check, dated October 21st, 1848, for $100 ; he presumed the check was paid; he loaned Bennett the money on it.   The notes of December 23d, 1848, (the one mentioned in the complaint,) and November 21st, 1848, were in witness' hand-writing; one grew out of the other, on renewals of the same length of time ; on these the defendant paid witness seven per cent interest, and nothing more; gave the witness nothing more, except what he owed him.   Witness made the loans at his office; probably behind the screen.   The witness did not take Grimsteed's note for $135, and three gold watches as collateral security; the first loans he made him, he (witness) took one or two watches, and gave them up to the defendant ; he did not receive these two watches, but two which he had sold the defendant for $107 or $108, with the privilege of returning them within a year, at $100 ; defendant had two watches, and bought them back within thirty days.   Witness said he had no knowledge of receiving $50 from the defendant, on Saturday, 2d of December, 1848; and had no memory of

Fay *v.* Grimsteed.

the defendant's coming in about 3 o'clock and paying witness $50. James Bennett testified: That he indorsed a check drawn by the defendant on the Long Island Bank, for $300, and dated seven days ahead; he did not recollect the date, but believed it was in August, 1828. In about a week, the defendant came back with the check, and another for $300, which witness indorsed, and continued weekly to indorse a new check, dated seven days ahead; this continued a good many weeks; the old checks were torn up as the new ones were given. On the 21st of October, 1848, witness gave his check on the Atlantic Bank, for $100, to Mr. Fay, at his office; witness did not receive any money for it; he paid it for the defendant. Witness gave Mr. Fay a check, drawn by the defendant and indorsed by witness, October 21st, 1848, for $200. It was drawn and dated seven days ahead; was also renewed, and the note upon which this suit was brought, was part of the same original transaction; it was reduced from the first check, down to $200; there was a check intermediate the first $200 check, and the one on which suit was brought; witness paid no interest.

The defendant's counsel summed up the cause to the jury, and contended before the judge that the plaintiffs, aside from the question of usury, were not entitled to recover upon the check in suit, because they had not averred or proved that the defendant had not funds in the Long Island Bank, wherewith the check might have been paid; or that the same had been presented at the bank for payment, and notice of the non-payment thereof given to the defendant. After the plaintiffs' counsel had closed his summing up to the jury, the judge asked him what he had to say to the legal objection raised to the recovery upon the check. The counsel then argued the question before the judge, who, however, gave it as his opinion, that no recovery could be had upon the check. The plaintiff's counsel then asked the judge to make an order that the plaintiffs have liberty to withdraw the check. To this the defendant's counsel objected, unless the plaintiffs would submit to a nonsuit upon the check; but this was refused. The judge declined to make any order in the premises, but told the plaintiff's counsel he must take his

own course at his own risk. The plaintiff's counsel then said that he would withdraw the check, but again refused to submit to a nonsuit upon it. The defendant's counsel refused to assent to such a course. The judge then charged the jury, that the check having been withdrawn, the only remaining question was, whether the plaintiff contracted to receive more than seven per cent interest on taking the note. That if, by any contrivance, or under any pretense, the plaintiff, on taking the note in question, contracted to receive, and the defendant contracted to give, more than at the rate of seven per cent per annum for the loan or forbearance of money, it rendered the contract void, and that it was for them to determine from the evidence whether such unlawful interest was contracted for, and if they found that it was, their verdict should be for the defendant; if not, for the plaintiffs.

To all this charge the plaintiffs counsel excepted, and insisted that the judge ought to charge the jury, that unless they believed from the evidence, that upon the loan of money represented by the note, there was an agreement to pay interest at the rate of fifty cents a day for each one hundred dollars, or the payment of interest at that rate in connection with said loan, the plaintiffs were entitled to recover. The judge refused so to charge; but charged that if the contract was for more than at the rate of seven per cent per annum, it was usurious and void. To this refusal and charge the plaintiffs' counsel excepted. The jury found a verdict for the defendant.

*J. W. Gilbert*, for the appellants.

*Edwards Pierrepont*, for the respondent.

*By the Court*, BROWN, J. The counsel for the plaintiffs asked the court upon the trial of this cause, to charge the jury in substance, that unless they believed from the evidence that upon the loan of money represented by the note, there was an agreement to pay interest, of the exact character set up in the answer, the plaintiffs were entitled to recover. The judge re-

fused so to charge, and I think he was right.    That the defend-
ant was required in his answer to state the usurious agreement
as it existed, will hardly be denied.    There is no longer any
such plea as the general issue, and there can not be an answer
in that form.    The practice which once prevailed, of giving the
defence of usury in evidence under the general issue in assump-
sit, which was a general denial of the promise to pay, has been
taken away with that form of pleading.    It is one of the princi-
pal objects of the code of procedure to abrogate the old forms
of pleading, and to bring the parties to a plain, concise and di-
rect statement of the facts which constitute the cause of action,
or the defense, in place of the general statement heretofore in
use.    The form of allegation and counter allegation was adopted
with a view to compel the adverse parties to disclose to each
other the facts upon which they rely, to uphold the claim upon
the one side, and to maintain the defense upon the other; so
that each may know what he will be required to establish or
repel by the proofs upon the trial.    In this respect the plead-
ings are similar to those which obtained in the courts of equity.
The defense of usury must therefore be distinctly set out in
the answer of the defendant, where he means to rely upon it as
a defense, and the terms of the usurious contract, and the quan-
tity of interest or premium taken or agreed to be given, must
be distinctly and correctly stated.    (4 *Paige*, 526.)

The real question, however, involved in the refusal of the
judge to charge as the plaintiffs requested, is that of variance
between the pleadings and the proof.    Formerly, when usury
was pleaded to an action on a specialty, or set up in the plea
or answer to a bill in equity, the defendant was required to
prove the agreement as stated; and if the proofs disclosed a
usurious agreement different from that stated in the plea or
answer, the defendant failed in his defense.    (3 *Durn. & East,*
538.  4 *Paige*, 533.)    So that it sometimes happened that a
party with a good defense of this nature, was defeated upon
the trial or hearing, because the facts by which it was to be
made out were imperfectly known, or inaccurately stated at the
time the issue was framed.    This is also one of the defects in

Fay *v.* Grimsteed.

the ancient system which the code seeks to correct; a variance between the pleadings and the proof sufficient to defeat the action or destroy the defense, must leave the case unproved in its entire scope and meaning. If left unproved in some particular, or particulars, it is a subject for amendment, upon terms, if the adverse party has been misled by it; otherwise, amendments may be made at the time of the trial, and without any conditions whatever. (*Code,* §§ 169, 170, 171.) The gist of the defense in this case was the corrupt agreement for a larger rate of interest than that allowed by the statute, which the law denominates usury; and had the agreement proved upon the trial provided for a rate of interest forbidden by law, although greater or less in amount than that set out in the answer, it would have been a case for amendment within the 169th or the 170th section, and not such a failure of proof as would have entitled the plaintiff to a verdict.

The jury rendered a verdict for the defendant, and the plaintiffs made two other points upon the argument at bar. 1st. That the judge erred in the charge he did give to the jury. 2d. That the verdict is unsupported by the evidence. Both these points must, I think, be determined for the plaintiffs. The action was upon a promissory note; that it was made by the defendant, was payable to the order of the plaintiffs, and was a renewal or continuation of a series of notes, the original of which was given for money lent by the plaintiffs to the defendant, were facts established at the trial. The only defense was a usurious agreement to pay at the rate of fifty cents per day, for the use of each hundred dollars mentioned in the note. The burthen of this defense rested upon the defendant. When the plaintiffs rested their case their right to a verdict was clear, and unless the usurious agreement was made out by the evidence to be given, the court and jury were under a binding obligation to see that this right was not defeated. The defendant examined three witnesses—two of them, the plaintiffs in the suit, and the other, James Bennett, the indorser upon certain checks which accompanied the notes. As I read the testimony, not one word was elicited, from either of these witnesses, tending to estab-

Fay *v.* Grimsteed.

lish the defense. It was proved that the plaintiffs were money brokers, that the notes were all payable four days after date, that the renewals had been frequent, and that Fay made the loan, and drew the notes, while alone with the defendant at his desk, behind a green screen, in a basement room in Wall-street. Fay testified that the loan was made at seven per cent, and that no more than that rate of interest was taken. When the attention of the counsel for the plaintiff was called, upon the argument, to the absence of proof in connection with this evidence, we were told that Fay's manner, while under examination, discredited him with the jury ; that his answers were evasive and incoherent, and that he became confused and sick, and required water to drink to enable him to go through the examination. Admit all this to be true : admit, for the sake of the argument, that the witness' deportment and answers were such as should discredit him, and what then? He was one of the plaintiffs, it is true, and I am not prepared to say that such circumstances might not have strengthened an otherwise feeble case, on the part of the defense. But in the absence of all other proof, they amount to nothing ; because there is nothing in the defendant's case to be corroborated and strengthened by circumstances of mere suspicion. The most that could be claimed for the defendant would be, to strike Fay's testimony from the case altogether, and then it would stand precisely as it did when the plaintiff rested. The short time at which the notes were made payable, the frequent renewals, the manner of one of the plaintiffs while under examination as a witness, even the green curtain drawn round the broker's desk in a basement room in Wall-street, are circumstances of themselves which afford no evidence whatever that the note in controversy was tainted with usury. A verdict resting on such grounds can not be upheld. It is a verdict against the law. And to suffer it to stand could have no other tendency but to weaken the security of property and lessen the respect which belongs to the administration of justice.

When the proof was closed and the cause had been summed up by the counsel on both sides, the court charged the jury that " the only question was, whether the plaintiffs contracted to re-

Fay *v.* Grimsteed.

ceive more than seven per cent interest on the note, and that if by any contrivance, or under any pretense, the plaintiffs, on taking the note in question, contracted to receive, and the defendant contracted to give, more than at the rate of seven per cent per annum for the loan or forbearance of money, it rendered the contract void : and that it was for them to determine, from the evidence given, whether such unlawful interest was contracted for, and if they found that it was, their verdict should be for the defendant ; if not, for the plaintiffs." To this charge the counsel for the plaintiffs excepted, and I think the exception well taken. The charge contains a simple and correct exposition of the law of usury, as applicable to the case under consideration ; and had it ended there, would not have been open to any objection. But when the learned judge proceeded further, and told the jury " it was for them to determine from the evidence given, whether such unlawful interest was contracted for," I respectfully think that he erred ; because his language implied, that there was something upon which the jury might exert their judgment; some field wherein they might exercise their discretion, and some evidence from which they might legally infer that the usurious agreement was established. What else could they suppose this portion of the charge to mean? They were told, " it was for them to determine from the evidence whether such unlawful interest had been contracted for ; and if they found it had been, their verdict should be for the defendant." From what evidence were they to determine this question? From the evidence given upon the trial, certainly, for there was no other evidence that the jury had heard, or with which they had any thing to do. Jurors are constantly inclined to look to the opinion of the judge for instruction as to what is and what is not evidence. In this respect their duty and their inclinations are in harmony. In regard to questions of law they expect to be guided by his superior knowledge, and to confide in whatever intimation comes from him : and when he tells them to determine a given problem, from the evidence before them, they can hardly do otherwise than infer that in his judgment there is evidence upon which their verdict, when given, may rest for support. Where immaterial evi-

dence is improperly admitted, a new trial will be granted, for a reason similar to that to which I refer, to wit : that the decision of the judge admitting the evidence to be given, made in the presence of the jury, is the expression of an opinion, that they may regard the evidence, in their deliberations.   And it then becomes impossible to know how far it may have have influenced their judgment.   (2 *Hill*, 292, *note a.    2 Barb. S. C. R.* 190.) If the case contains the testimony as it was given upon the trial, I think the jury should have been told that there was no evidence to sustain the defense of usury, and that the plaintiffs were entitled to a verdict.   For these reasons, I think there should be a new trial, with costs to abide the event.   (17 *Wend.* 501. 21 *Id.* 615.   6 *Hill*, 444

McCoun, J. concurred.

Morse, J. was of opinion that the verdict was against the weight of evidence, and should be set aside on payment of costs ; but that it was not a verdict without any evidence to support it.

New trial granted, and the costs to abide the event.

